PENNSYLVANIA STEEL CO. v. PETTIBONE, MULLIKEN & CO.

(Circuit Court of Appeals, Third Circuit. October Term, 1905.)

No. 5.

PATENTS—INFRINGEMENT—RAILROAD SWITCH STANDS.

The Strom patent, No. 498,196, for an improvement in railroad switch stands of the Mansfield type, which consists in placing the crank which moves the connecting rod on the target shaft below the segment gear, but within the case, for the purpose of breaking the force of the wheel thrust of cars against the gearing when the switch is operated automatically, is not infringed by a switch stand in which the crank is placed on the end of the target shaft extended below the casing for the sole purpose of allowing the gearing to be completely inclosed by the case, and thus protected from clogging by sand or snow.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 133 Fed. 730. See, also, 134 Fed. 889.

Walter C. Pusey and Joshua Pusey, for appellant.
Philip C. Dyrenforth, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

DALLAS, Circuit Judge.    Patent No. 498,196, dated May 23, 1893, was issued to Axel A. Strom, assignor, etc., for an improvement in switch stands of the class of which the "Mansfield switch stand" is typical, and that stand is described in the opinion of the court below as follows:

"The Mansfield stand consists of a case and base inclosing the segment gear, a vertical target shaft, upon which a horizontal segment gear is rigidly fixed, and which meshes with a vertical gear fixed to a horizontal bar extending back and out of the case, to which is attached an arm weighted at the end. The stand is bolted firmly to the ties outside the track. The connecting rod is pivotally connected to the lateral extension upon the horizontal segment gear, designated 'the crank lug on segment gear,' and at the other end it is secured in the usual manner of connecting rods to the rail of the point or split switch that is to be operated. The switch is operated either by hand by an attendant, or automatically. When by the former, he raises the weighted arm and throws it over to the opposite side; in which operation it describes a half circle of 180°. This turning of the weighted arm turns the arm shaft, and with it the vertical gear, through a half circle, and, by reason of the relative radii of the vertical gear and horizontal gear, it moves the latter through an arc of 90°. The segment gear being rigidly fixed to the target shaft, the latter, and with it the target shown toward its upper end, is correspondingly turned through an arc of 90°. Manifestly, therefore, the turning of the weighted arm in a half circle, which turns the segment gear through an arc of 90°, draws the connecting rod, attached to this segment gear, with it, and thus shifts the switch rail to which the connecting bar is secured. To reset the switch it is only necessary to return the weighted arm to its original position. Secondly, should the switch be set against a train passing through trailing, and no attendant to turn the switch, it is intended to be operated automatically by the foremost wheels of a locomotive or car passing through the switch. In this event the flange of the wheel strikes the switch rail, and thrusts it over against the stock rail with a force measured by the speed of the train. The blow struck by the wheel against the rail is transmitted by the connecting-rod directly to the crank lug; the segment is turned by the thrust through an arc of 90°; and the vertical beveled gear, and with it the arm shaft and weighted arm, is thrown over through an arc of 180°."

In aid of this description a drawing of the Mansfield stand is here inserted:

In this drawing A is the case, B is the base, C is the target shaft, D is the switch-rod connecting bar, E is the segment gear on shaft C, E' is the gear on shaft F, F is the shaft having the weighted arm or lever G, and C' is the crank lug on segment gear.

The claims of the Strom patent (all of which the Circuit Court held to be valid, and to have been infringed by the appellant) are as follows:

"(1) In a switch-stand, the combination with the casing of a rotary-shaft having a crank-section at which to connect the switch-bar, a gear, E, fastened to said shaft at a point beyond its crank-section where the springy quality of said shaft between the gear and crank may play, and a shaft, F, carrying a gear, E', meshing with the gear, E, and a weighted arm, G, substantially as and for the purpose set forth.

"(2) In a switch-stand, the combination with the casing of a vertical rotary target-shaft having a crank-section at which to connect the switch-bar, a gear, E, fastened to said shaft at a point above its crank-section where the springy quality of said shaft below the gear may play, and a shaft, F, carrying a gear, E', meshing with the gear, E, and a weighted arm, G, substantially as and for the purpose set forth.

"(3) In a switch-stand, the combination with the casing of a base, B, a vertical rotary target-shaft having a crank-section at which to connect the switch bar, a gear, E, fastened to said shaft at a point above its crank-section where the springy quality of said shaft below the gear may play, a shaft, F, carrying a gear, E', meshing with the gear, E, and a weighted arm, G, and stops, m, on the base in the path of the weighted arm at opposite sides of the shaft, F, substantially as and for the purpose set forth."

It is not necessary to examine these claims in detail, for, from the specification, and from the testimony of Strom himself, it plainly appears that his entire invention (if he made one) was based upon the hypothesis that there was "a degree of springiness" in the Mansfield target shaft which could be utilized to obviate the breaking and wearing of parts, which, as he asserted, had resulted from the stands being so constructed that—

"The full force of any excessive wheel-thrust against the switch is transmitted through the connecting-rod, not only to the crank on the target-shaft, but also to the gear connection thereof with the weighted arm."

To this transmission of force to the gear connection he imputed the disadvantages which he ascribed to the Mansfield construction, and to the prevention or mitigation of such transmission he accordingly directed his attention. He supposed, or, as is said in appellee's brief, he "discerned, that the evil lay in having the crank made as a part of the segment gear," and this evil he proposed to eradicate (as is stated in the specification) "by providing the crank as a section in the vertical target shaft, and providing thereon, for co-operation with a beveled gear on the rotary horizontal shaft carrying the weighted arm, a gear or gear segment, secured on the target shaft so far above the crank section therein as to allow for a degree of springiness in the shaft below the gear thereon which will tend to take up any excessive wheel-thrust transmitted to the crank from the switch through the connecting-rod, and thus shield the gear from the effect thereof." In short the stand of the patent differs from the old Mansfield stand only in that, for the crank of the latter, a "crank section" in the target shaft is substituted, and this section is formed, not on the segment gear, but at some undefined dis-

tance therefrom, "where the springy quality of said shaft between the gear and crank may play." Fig. 3 of the patent, which makes this quite apparent, is here reproduced:

In this figure A is the case, B is the base, C is the target shaft, $C^1$ is the crank-section, D is the switch-rod or connecting bar, E is a beveled gear, which extends from a collar, at which it surrounds and is secured upon the target shaft near the top of the casing, and F is a horizontal rotary shaft carrying inside the casing, in mesh with the gear, E, a beveled gear, $E^1$.

It is not requisite to pass upon the validity of this patent, and therefore we need not determine whether the target-shaft of a switch-stand is really endowed with a springy quality capable of performing the service which Strom assigned to it, or whether, if it is, there was in fact any such defect in the Mansfield structure as the patent assumes, and for which, if there was, it supplied a remedy. But it is clear, at least, that the monopoly which was granted (whether properly or not) has not been invaded by the appellant. Its stand does not have a crank section, but a crank, and that is placed where it is, not for the purpose, nor with the effect, of utilizing any springy quality (actual or supposed) of the target shaft, but to permit a wholly distinct and manifestly useful object to be accomplished. It is the Mansfield stand, modified only by extending its target shaft through the bottom of the case, and putting its crank on the free end of the extension; and this modification, as the evidence shows, is intended to, and does, provide a switch-stand in which the segment gear and pinion may be completely inclosed, and thus protected from clogging by snow, sand, or rubbish. No such end was contemplated by

Strom, nor would the means he disclosed have attained it.   The several figures of the patent all exhibit an organism having the crank-section within the "case or housing for the internal mechanism," in which there is, and must be, an opening for the passage and play of the switch connecting rod; and the statement of the specification that the gear "is removed as far as possible above the crank-section" obviously means that those parts are to be as widely separated as the dimensions of the case, in which both are contained, will permit.   As the court below observed:

"The patent in suit, or the Strom patent, places the crank below the segment gear, but inside the case."

And this the appellant has not done, and could not have done without defeating the object it had in view.   We are convinced by the proofs, not only that the alleged infringing construction was in good faith contrived to render the production of a closed case practicable, but also that it does not even incidently bring into serviceable action any springy quality that the target-shaft may possess.   The crank is not placed as far as possible from the gear, but as near to it as, in view of the extension of the shaft below the casing, it can be placed; and in this connection it is worthy of note that to his crank-section (which, as we have said, the appellant's device does not have) the patentee attributed a material share of the springiness which he ascribed to the shaft as a whole. In his specification he said:

"In case the force of the thrust of the wheel against the switch is excessive, instead of its being exerted fully against the teeth of the gears, E and E', with the danger of breaking them or so wearing them as to impair their operation, the excess will be taken up by the spring in the crank section, C', and portion of the target shaft between it and the gear, E, thereby saving the gears."

The substance of the whole matter, then, appears to be that to facilitate a useful object, which was neither contemplated nor effected by Strom, the appellant has removed the crank of the Mansfield stand from the interior to the exterior of the case, and in doing so has necessarily detached it from the gear; and, if this had not been done before, it would be difficult, we think, to sustain a patent which, being rightly construed, would inhibit it.   But it had been done before.   In a drawing accompanying the German patent to Schmidt, issued June 5, 1888, for a "self-acting switch," there is shown, and as we perceive it, quite plainly, a thorough and absolute separation of the crank from the gear, and whether, by reason thereof, any springy quality of the shaft was brought into useful operation, we need not inquire, for the means to that end which the patent in suit provides—the separation of the parts—is in the Schmidt drawing represented to be about as great in point of distance as in the stand of the appellant, and might, of course, have been made even greater.   And the testimony of the witness Parsons upon this point seems to us to be no less important.   The learned judge of the Circuit Court thus summarized it:

"He testified that they had made another pattern of stand, the same as defendant's alleged infringing stand, prior to 1890, and stated that, while manufacturing the old form of Mansfield stand by the old company, they had occasion several times to furnish stands with the crank below the case, in order that the stand could be placed so that the switch-connecting rod could be covered or brought below the surface of station platforms, and that this was

done by simply making the target-shaft longer, with a crank on the lower end of the shaft beneath the case, leaving the segment gear and pinion in the same position as in the Mansfield stand. The aperture in the stand was generally left open, but upon one occasion it was closed; and further claims that at that time no importance was attached to placing the crank upon the target-shaft; that later on the Lake Shore had experienced a great deal of trouble by stands becoming clogged with sand in the summer time and snow in the winter time, and that led the defendant company to get up another pattern of frame adopted for inclosing the gear, having a crank below the case on the proper level for attachment to the switch connecting rod."

This testimony is not incredible. It was not contradicted. The witness who gave it was not impeached. It appears not to have been doubted that the stands he mentioned had in fact been made and used; but, because the learned judge was "not convinced that the witness was certain as to his dates," this evidence was wholly disregarded. We, however, are of opinion that it was entitled to consideration, and that it should have been accepted as showing, at least, that upon no admissible construction of the patent in suit could the charge that the appellant's switch-stand infringed it be sustained. Mr. Parsons was the superintendent of the defendant company, but the story he told was inherently probable, and we find nothing in this record which would justify a suspicion that he did not intend to testify candidly; and, while it is undoubtedly true that evidence of prior use should be clear and convincing, we see no reason to doubt that he was, as he said he was, enabled to fix the times when the stands he described were made, by relation to the happening of the other events to which he referred, and about which it is extremely unlikely he could have been mistaken.

Having reached the conclusion that the Circuit Court's finding of infringement was erroneous, its decree is reversed, and the cause will be remanded to that court, with direction to enter a decree dismissing the bill of complaint, with costs.